Our final case this morning is number 17-1095 Pioneer Reserve, LLC v. United States. Mr. Cale, is that how you pronounce it? May it please the court, good morning. Yes, Douglas Cale representing the appellant in this matter. So of course what we have here is a breach of contract action. The court decided that our mitigation bank agreement was a contract. The court decided that the government reached the contract, but then went further and said the problem was though my client had two competitors, they were willing to undercut our prices and therefore we couldn't prove and did not prove that in the non-breach world we would have solved it. What is the contract here? I've read the contract and it seems to say that the government would give your client a certain number of credits. You say that that was incorrectly computed, I guess for the moment that it's accepted that it was incorrectly computed that you should have had 124 credits instead of whatever it was, 17. But the contract is not very clear about what it's promising other than to give you the credits. Do you view the contract as incorporating the regulatory scheme here? Well it certainly is written in a backdrop of the regulatory scheme, but the operative language of the contract, of course the court determined it was a contract, is the operative language says first of all that it awards these contracts and it goes on to say that the mitigation banker, my client, can use, sell, convey these credits in commerce. What does that mean in accordance with the regulatory scheme? It has to be because these credits are meaningless without a regulatory scheme. They only have value in the context of the regulatory scheme, which provides for mitigation being required in order to have a permittee under 404 impact the environment. Okay, so what we have here, as I understand it, the government has conceded that under the regulatory scheme, if it had had the right number of credits, 124 credits, that it would have required the railroad, at least initially in the permit, to purchase those credits, right? Correct. So the question is whether that transaction would have occurred, that is where the parties would have reached agreement, and whether if they didn't reach agreement, that the government would have changed the terms of the permit as it did with respect to the 17 credits. And I've read parts of this record, and I guess what's missing, it seems to me, is any suggestion that the transaction would have gone through at the 79,000 or 89,000 per credit level, or that the permit would have required that it go through at that level. I mean, I think your witness testified, if I recall correctly, that that price of 79 or 89,000 was not something that your client would depart from. Two arguments, Your Honor. First of all, sure, so that is the question. Would we have sold credits to the railroad in a non-breach world? The court, trial court, as you observed, found that there's no question, no question on page 11 of the decision that in a non-breach world, the court would have required the railroad to buy all of it. Sure, as an initial matter, but the question is whether they would have modified the permit if the parties reached an impasse as to the price. Which the court did, post-breach, they allowed then this railroad to go to two other sources, and consistent with that, what does the trial court say? Well, unfortunately, Pioneer's downfall, back on page 14 in the decision, the downfall is that Pioneer had two competitors willing to undercut their prices. That was their problem. The problem is, that finding by the court is contrary to the clear evidence. What did it find, or what did it say were the two competitors that were willing to undercut Pioneer's prices? Great Land Trust and Sioux Connect. Look to what their witnesses said. Their witness, Dr. Guion, in response to questions from the court, talking about who the competition is. Dr. Guion says, quoting, looking at page 1649 from the appendix, Dr. Guion says, in quotes, Sioux Connect would not have been a competitor, period, in quotes. How clear can it be? Their expert, not our expert, their expert testified. I don't think there's any question that you would have been the first choice for credits under the regulatory scheme. That regulatory scheme doesn't mandate that the purchaser go with you if it can't meet an agreeable price, correct? If the court will change the permit. Let's see what their expert said about that very question. As a matter of the regulatory scheme, if the court directs the purchaser to go to you first, and you negotiate, you reach an impasse, can the purchaser go back to the court and say, we can't reach a mutually agreeable price, modify the permit to let us go elsewhere? Go with yes. But what's the question in the context of this case and these facts and the evidence adduced at trial? Dr. Guion goes further to say, in response to questions in the trial court, talking about this scenario and the different types of mitigation, the different tiers, mitigation bank credits being the best, dropping down, Dr. Guion says, as to specifically the railroad that Sioux Connect, one of the supposed competitors, he says, they would not have been competition if they had made a bid in a non-breach world, the bid would have been void. I don't understand that. What we have here is a situation in which your client testified that they would have insisted on a price of $79,000 or $89,000, correct? Sure. Okay. And is there any testimony that the railroad would have paid that much for the credits? Well, here's the evidence on that point, Judge. No, no, just answer the question. Is there any testimony that the railroad would have paid that much for the credits? I'm going to say sure. You know where the railroad is a state agency, the Alaska Department of Transportation, another state agency, two different occasions, bought our credits for $79,000. That's different state agencies, though. It's not the railroad. In fact, the railroad, when you were negotiating a price for the 16 credits that you were improperly reduced to, rejected a bid of $88,000. And why did the railroad, how were they ultimately able to buy credits instead for $10,000 apiece, and I think it was $29,000 apiece from Great Ranch Trust. How were they able to do that? Because post-breach, they then allowed the railroad to buy credits that Dr. Guion said were not appropriate, that they would be void. And look at what Nicole Hayes said, one of the supervisors in the Alaska Corps Regulatory Division. She is talking about, once Dr. Guion says, well, Suknyik, that wouldn't be competition. The trial court then, he's asking Nicole Hayes, and she's talking about the Great Land Trust. As you recall, the Great Land Trust doesn't sell mitigation bank credits. They sell these things called in-lieu fee credits, which is nothing more than an unsecured promise to take your money and one day buy the credits. You know what? I get all this. There's no, like I said, there is no dispute that yours were the best credits. They had the highest priority level, and the Corps was going to try to force the railroad to buy your credits. But the Corps still had options to modify the permit. That's what it in a post-breach world. You have to show in the pre-breach world that it would not have exercised those options and that it would have made the railroad use all of your 124 credits at 89,000. And what does Dr. Guion say about that? Again, their witness. The judge is asking him, okay, what do you think about Pioneer's argument that if things have been done correctly, in other words, in an iron breach world, if things have been done correctly, Pioneer says that the Corps would not have gotten down into lower tier forms of mitigation. What do you think about that? What did Dr. Guion say? He says, and I'm reading from page 1651 of the appendix, he says, if Pioneer had 160.2 pedestrian credits, which we did, if they hadn't been taken away, he says, their witness, if we had those number of credits, then he agreed with Pioneer that the Corps would have said to the railroad, in quotes now, you need to buy 160.2 credits from Pioneer. Well, yes, initially they would have said that. But then when the parties couldn't reach agreement because they were so far apart on price, based on past experience, it looks as though they would have modified the permit. And you don't have any testimony that they wouldn't have modified the permit. We have testimony that they did modify the permit. They actually, to allow these void credits to be bought, they allowed these in lieu fee credits to be bought, which in their... I don't understand how that helps you. I mean, that shows that the Corps, in response, I mean, in the post-breach world, when you're negotiating over the 16 credits, that they would hold the railroad to your $88,000 offer. I mean, I understand you're pointing to your expert's testimony, but we have these other factual evidence, and we're on a clear air review on this point, aren't we? Well, if there's other factual evidence supporting the notion that the Corps would not have forced the railroad to purchase your credits at $89,000 because they were too expensive, then doesn't that end the case? No, it doesn't. Because post-breach, yes, absolutely, the Corps allowed railroad to buy mitigation, which their expert said is inappropriate. And what Nicole Hayes, their supervisor, says is inappropriate mitigation. She says what we would require is something that actually offsets impacts. Here's an example for you. But here's the have enough overall credits to sell, but you still had 16. And so if they were the best credits, and that the Corps wanted those credits to be used, why wouldn't they have forced the railroad to buy those credits at that price, at the $88,000 reduced price? And then, because there were no other credits available, move on to the lesser forms. In a non-breach world, they should have. Here's the example, a very brief example. I think it illustrates it. I signed a contract to buy a thousand Rolex watches for $5,000 a piece. I signed a contract. And then somebody says, Doug, are you crazy? You can buy knockoff Rolex watches all day long for $50 a piece in the streets of New York. I tell my party to the contract, hey, listen, I'm not going to buy your Rolex watches. But I tell you what, though, if you'll sell them for $50 a piece, I'll buy them from you. Obviously, that person, because they're selling genuine Rolex watches, not void Rolex watches, not inappropriate knockoff watches, he says, I can't match that price. These are genuine mitigation bank credits. These are genuine Rolex watches. But the Corps allowed the credits to be bought that you say are void or that the Corps shouldn't have allowed those credits to be bought? Absolutely not. In a non-breach world, we contend more likely than not, the Corps would not have allowed them to buy these void credits. Their experts said so. But they did allow them to buy. We understand they did. They breached the contract. And they allowed them to buy these fake credits, if you will, knockoff credits. Why do you keep calling them fake? I mean, the regulation allows three different tiers. What does their rule call it? They're not the most preferable, but they're not fake. They are inappropriate. According to their testimony, their person's testimony, that alternative, the Great Land Trust in lieu of fees, were inappropriate. So here's the question, in a non-breach world, is it more likely than not that... That's your sole argument, that the Corps couldn't appropriately allow these credits to be purchased from another source? Yeah. Well, that's two arguments. That's one of the arguments, is that in a non-breach world, it's more likely than not, they would not have dropped down the hierarchy and allowed the permittee to buy credits that their experts said would be void. Even though in the breach world, they did exactly that? That's what they did in the breach world. The fact that the breach doesn't have any bearing on whether they would have exercised their authority under the regulation is to drop down or not. I don't see the connection between the two. To that point, let's look at the other evidence that the trial court ignored. Why didn't you put on a damages model that didn't demand a price that had already been rejected by the railroad and a rejection which the government approved? Well, our damages model of $79,000 is based on actual sales. And your witness said that you wouldn't have accepted anything below $79,000 or $89,000? Because the best evidence was that was a fair market value. The other evidence is that the railroad would never have agreed to that price and that the Corps, in a similar situation, would have granted their permission to modify the permit and get lesser credits. What would be the response to that? Again, at a preponderance of the evidence, what's the suggestion or where's the evidence that if the Corps stayed by the contract, stayed, followed the regulations, what's the evidence that they would not have required the railroad to buy all the mitigation from us as the court found that would have been ordered? Mr. O'Connor, I think we're out of time. We'll give you two minutes for rebuttal. Thank you. I mean, Mr. Kale. Mr. Wong is next. Thank you, Judge Diken. May it please the Court. The trial court correctly concluded that Pioneer failed to prove causation. This is a very strange case because, I mean, I think you concede breach or at least you lost on breach and you're not challenging that anymore. And so it seems like at a certain point, there would have been a price that the Corps would have forced the railroad to accept. And so that there would have been actual damages. But we're here now apparently because the other side refused to put on a price that would have been appropriate damages and therefore they're not entitled to a remedy at all. That seems really peculiar to me. Your Honor, the issue is, I mean, there are steps in the process of proving damages, of course. And the problem is that there was never a willing buyer and a willing seller. I mean, there's evidence in the record that they negotiated and, as you referenced, Pioneer came down to a price of $88,000 approximately. They weren't willing to go lower. They went as low as $79,000 for a transaction with another state agency, the Department of Transportation. And there's also evidence in the record demonstrating that that was the lowest where they were willing to go for that transaction. But your expert... Showing that they'd go lower. Right. I get that. That's why this case is strange to me. Your expert testified that there was some price that would be an appropriate amount of damages. I don't know, is it the $20,000, $29,000, whatever it was. It testified to a range, Your Honor. Yes. And why isn't that a concession that, at that price, the government would have forced Pioneer or would have forced the railroad to buy Pioneer's credits, all $162,000 at $29,000? Well, there are two issues with that. The first is it assumes that under $29,000, there would have been some sort of negotiation, not only with Pioneer, but also with Great Connecticut, although that's more complicated. They still have the credits, right? The credits are there. They've lost the credits. Correct, Your Honor. I think my friend would disagree with the exact number, but yes, they still are a functioning mitigation bank in Alaska. Okay. So what their breach claim is that they lost a particular opportunity to sell those credits to the railroad. Correct, Your Honor. And the question is whether they proved that that opportunity would have come to fruition in the non-breach world. That's the problem. It's not as though the credits are gone. Correct, Your Honor. And there's no evidence as to what the credits are worth now, right? No, we don't. Outside of the record, there may have been sales, but there's nothing in this record. No, Your Honor. To go to Judge Hughes's question that our expert did apply to a price range, that would go to quantum. But before you get there, you need to have a transaction. And we're aware of precedent that says you need to reach an exact price. If your expert said the credits are worth $30,000, and somehow they at least have to show that the credits are no longer worth $30,000, and they didn't put on any evidence to that effect, right? Right. They made a lost profits claim, Your Honor. It's based on a potential transaction, and the transaction they specified was a sale to the Alaska Railroad Corporation. I know this isn't before us, but I'm just curious. So there was a reduction from roughly 160 credits to roughly 16, and then back up to roughly 30 or something, I think. It's not quite that simple in terms of clustering credits, but yes. But what is... And that's, I take it, all under the contract with the government for setting up this bank. Is there a process for challenging that reduction within the agency, or is that just no longer an issue that everybody agrees the whatever number you have now left, which is lower than 160, is the right number? Well, I don't know that there's an administrative process, Your Honor, which may be what you're and is, as far as I'm aware, an informal process of approaching the court. I mean, this is a much discussed issue in terms of the number of credits that will be deemed appropriate within a given bank, and that can go back and forth. And that did occur. Yes. So just the pioneer, my friend here, pointed to our expert's testimony quite a bit. I don't think it does what he contends, and I'd just like to point to the court, not necessarily to read now, but page... Appendix 1650, 1651, our expert explains that what he's doing in developing his damages model, the theory, is assuming a breach to 160.2 credits, the full amount that the railroad needed for this permit. The trial court, as we explained in our case, page 139, reached a more limited holding on a breach as to 124.7 credits. So a different chain of events occurs in the non-breach world in that instance. Out of the 160.2 total required in the non-breach world, the railroad is directed initially to purchase 124.7 from Pioneer. The remainder, we can fairly assume, goes to Sue Kinnick. Sue Kinnick would charge $10,000. We then reach the exact same situation to the extent the railroad was not already aware that Pioneer's pricing was exorbitant. They would then have learned that Pioneer's pricing was exorbitant, and we move along the same path for 124.7 credits as we did for 16.92. And I think the key here, in terms of my friend bringing up the Seattle State Department of Transportation, there's testimony from Mr. Lindemood of the railroad saying that he found... He was astounded by the evidence. He found them ridiculous because he had just purchased 143 credits for $1.4 million, and Pioneer was attempting to sell 17 credits for approximately $2.5 million. I just want to touch quickly on the question of whether the trial court imposed the incorrect standard. I think it's clear from the opinion, and at one point the court says that it was unlikely that the railroad would have purchased Pioneer's credits. I think it's a clear indication that preponderance of the evidence standard as was proper. And finally, Pioneer points to the testimony of Lieutenant Colonel DeRocky. That testimony only shows his opinion. It doesn't show anything about the chain of events that we've described, which would have led to the exact same result for 124.7 as for 16.92. And if there are no further questions. Okay, thank you. Mr. Galli, a few minutes. Opposing counsel mentions Lieutenant Colonel DeRocky. During the trial, it came out that Lieutenant Colonel DeRocky at the time was the commander of the Corps Regulatory District up in Alaska. Came out, he conducted an investigation to all allegations involved here. After the investigation, he then admitted that the Corps breached the contract. Of course, the court made that separate finding. And Lieutenant Colonel DeRocky further admitted that that breach caused Pioneer to lose a $12.6 million sale. This is the man in charge of the Regulatory Division for Alaska. Him admitting the Corps breach caused the damages. If I was a defendant, personal defendant, and I breached a contract claim. Where exactly did he say that? Yes, sir. Page 624 through 625 in the appendix. Appendix page 625 starting at line 8. Picks up where DeRocky is talking about having made an investigation, completed an investigation. Well, first of all, this is not his testimony. This is your witness recounting his admission. But I don't see his admitting that you lost $12.6 million. Wait, wait, wait, you can't interrupt me. You cannot interrupt me. I apologize. I thought you finished. Okay. So what he seems to be saying is, and I said, well, you realize the magnitude of what that meant to me, the sale I lost? And he said, yes, $12.6 million, which can be read as saying, I recognize your view of what you lost. Not that, in fact, I agree that you lost $12.6 million. I think the plain reading of this, Your Honor, is DeRocky has already told him that, admitted that the court had no authority to take away my credits. That's up front there. And then he says, well, you know what that meant to me? You know what that, taking away the credits, meant to me? The sale I lost. And DeRocky then said to him, yes, he said, yes, you lost a $12.6 million sale. The judge admitted that in evidence. He says, well, I'm going to decide whether it's a breach or not. But the statement by DeRocky, which was not challenged, not rebutted, that that action by the court, taking away the credits, caused Pioneer to lose a $12.6 million sale, we of course know, causation of damages, calculation of damages, questions of fact, Blue Bonnet Savings says that. The man in charge of the division says, yes, I know that this breach caused you to lose a $12.6 million sale. I think that's the common reading, the plain reading of what this language is here. And if the defendant admits a breach, the defendant admits it caused Pioneer to lose a $12.6 million sale, the court totally ignores that, of course, in his decision. And I think so, again, the court's decision is contrary to that part of the evidence, the twofold. So any conclusion maintained on a number of fronts, the court's decision is contrary to the evidence. I think, Mr. Katt, we're about out of time. Okay. Thank you. Thank you, counsel. The case is submitted.